1  Tianyu Ju (State Bar Number: 323817)
   Yu Hao Yao (State Bar Number: 344022)
2  Glacier Law LLP
   9660 Flair Dr., Suite 328
3  El Monte, California 91731
   Telephone: 312.448.7772
4  Facsimile: 312.801.4587
   iris.ju@glacier.law
5  mickey.yao@glacier.law
   Attorneys for Plaintiff

6

7                    **UNITED STATES DISTRICT COURT**

8              **FOR THE CENTRAL DISTRICT OF CALIFORNIA**

9
   SHENZHEN CHETAIDOU KEJI              Case No.:
10 YOUXIAN GONGSI
                 Plaintiff             **COMPLAINT FOR**
11                                         1) **VIOLATIONS OF SECTION 1 OF THE**
        v.                                    **SHERMAN ACT (15 U.S.C §1)**
12                                         2) **VIOLATION OF SECTION 2 OF THE**
   ZHEJIANG CHIC ROBOT                       **SHERMAN ACT (15 U.S.C §2)**
13 TECHNOLOGY CO., LTD.,                  3) **VIOLATION OF THE CALIFORNIA**
   HANGZHOU CHIC                             **CARTWRIGHT ACT (CAL. BUS. &**
14 INTELLIGENT TECHNOLOGY                    **PROF CODE §16720)**
   CO., LTD., AND UNICORN                 4) **CALIFORNIA UNFAIR**
15 GLOBAL, INC.                              **COMPETITION LAW (CAL. BUS. &**
                 Defendants                  **PROF CODE §17000)**
16                                         5) **TORTIOUS INTERFERENCE**
                                              **CONTRACTUAL RELATIONSHIP**
17                                            **AND PROSPECITVE ECOMONIC**
                                              **ADVANTAGE**
18
                                       **DEMAND FOR JURY TRIAL**
19

20

                                -1-
                              COMPLAINT

NOW COMES Plaintiff Shenzhen Chetaidou Keji Youxian Gongsi ("Chetaidou" or "Plaintiff"), by and through its counsel, brings this action against Defendants Zhejiang Chic Robot Technology Co., Ltd. ("Chic Robot"), Hangzhou Chic Intelligent Technology Co., Ltd. ("Chic Intelligent"), and Unicorn Global, Inc. ("Unicorn," collectively "Defendants") under the Federal Antitrust Laws, the California Cartwright Act, the California Unfair Competition Law, and Common Law, and alleges as follows:

## <u>NATURE OF THE ACTION</u>

1.     This is a civil action for violation of Section 1 and 2 of the Sherman Act. Plaintiff's claims are based upon monopolization of the market for hoverboards through: (a) Defendants' wrongful enforcement of their patents through judicial systems against Plaintiff and other competitors; (b) Defendants' sham litigations against Plaintiff and other competitors, unenforceable and/or not infringed, with the intent to directly interfere with and adversely affect the business operations of Plaintiff and other competitors and thereby monopolize the U.S. and world markets for hoverboards.

2.     Plaintiff also brings this action, in part, under California law against Defendants for their tortious interference with Plaintiff's business operations. Defendants' intentional conducts have resulted in tortious inference with, and

disruption of, Plaintiff's existing and prospective business relationships with potential customers and suppliers.

## **PARTIES**

3.     Plaintiff Chetaidou is a company incorporated in China with its principal place of business in Shenzhen, China.

4.     Chetaidou is the manufacturer and seller of the fastest and the most reliable off-road hoverboard with an established brand "Gyroor". Chetaidou owns and operates a storefront on Amazon marketplace named "Gyroor".

5.     In the early months of 2015, Chetaidou registered its trademark "Gyroor" in the United States and has been using this trademark to promote its brand since then. Also, Chetaidou is the rightful owner of U.S. Design Patents D808,856 (D'856 Patent), D808,857 (D'857 Patent), and D891,297 (D'297 Patent, collectively "Chetaidou's Patents"). Chetaidou's hoverboard products are designed and manufactured solely based on Chetaidou's Patents.

6.     Defendant Chic Robot and Defendant Chic Intelligent are two Chinese companies incorporated and located in Hangzhou, China. They manufacture, import, export, distribute, and sell hoverboard products in the United States (the "Defendants' Products").

7.     On information and belief, Chic Robot and Chic Intelligent have close business relationships and overlapping identities. They use the same business name

"Chic" to carry on businesses and market themselves in the United States and around the world. Chic Robot has controlling interests in Chic Intelligent and has been controlling Chic Intelligent as of establishment. Also, Chic Robot and Chic Intelligent share the same management team and business address.

8.      Defendant Unicorn is a corporation incorporated under the laws of the State of California with its principal place of business in Ontario, California. Unicorn is the exclusive U.S. distributor of the Defendants' Products.

9.      Upon information and belief, Chic Intelligent and Unicorn entered into an exclusive distribution agreement and are the parties of plentiful settlement and/or licensing agreements ("Defendants' Agreements"). Also, they are listed as co-plaintiffs at various patent infringement cases.

## JURISDICTION AND VENUE

10.      The Court has original subject matter jurisdiction over the claims in this action under the antitrust laws of the United States, particularly the Sherman Antitrust Act, 15 U.S.C. §1, *et seq*. The Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. §1367.

11.      Venue is proper in this Court under 28 U.S.C. §1391 in that Defendant Unicorn resides within this Judicial District.

///

///

# GENERAL ALLEGATIONS

## A.  The Relevant Antitrust Market

12.     The antitrust product market unreasonably restrained by Defendants is the hoverboard market.

13.     Known as a self-balancing scooter, hoverboards are portable electric devices that move on two wheels. They entered the market around 2015 and have been gaining increasing popularity.

14.     Powered by lithium-ion batteries that are rechargeable, a rider is suspended on a platform between the two wheels. When a rider leans forward, backward, right or left, the wheels move in that direction.

15.     The hoverboard has become very popular among households around the world as it is a sports utility that can be used for recreational purposes as well as used as personal commute transportation solutions.

16.     Nowadays, anyone can purchase a hoverboard through online marketplaces or physical stores in his or her respective regions. In 2020, the global hoverboard market was valued at $781.2 million.[1] This market is expected to be worth around $1,312.3 million by 2030.[2]

---

[1] *See* Hoverboard Scooter Market by Type (Compact Size, Mid-size, and Full Size), Application (Personal Mobility Device and Business Purposes), Sales Channel (Online Sales and Offline Sales), and Speed Limit (Less than 15 Kmh and More than 15 Kmh): Global Opportunity Analysis and Industry Forecast, 2021–2030, https://www.alliedmarketresearch.com/hoverboard-scooter-market-A12257

[2] *Id.*

17.     Among the global regions, North America contributed the highest revenue in an amount of $274.2 million in 2020, and the revenue in North America is estimated to reach at $402.6 million by 2030.[3]

18.     The Federal Trade Commission and the Department of Justice, as well as many courts, use a hypothetical monopolist test to identify antitrust markets. Under this test, the market is defined by the smallest set of products in which the only seller of a product (i.e., the hypothetical monopolist) could profitability increase prices by a small but significant and non-transitory amount ("SSNIP").

19.     Under the hypothetical monopolist test, the hoverboard market is a relevant market as a hypothetical monopolist could profitably increase the prices of the hoverboard products by a SSNIP.

20.     Consumers have no reasonable alternatives when choosing the hoverboard products. Other products such as motorcycles, bicycles, and vehicles are not reasonably interchangeable with the hoverboard products. The industry recognizes the difference between the hoverboard products and other means of transportation in terms of weight, cost, and convenience. The mobility and convenience of the hoverboard products are not interchangeable with and cannot reasonably substitute for other forms of transportation due to its substantive

---

[3] *Id.*

differences. The hoverboard market is global in scope, as customers can purchase the hoverboard products from anywhere in the world.

21.    There are barriers to enter into the hoverboard products market. The hoverboard products industry is vulnerable to substantial financial loss due to the volatility of the unstable market conditions with drastic fluctuation in pricing and demand or supply. Such cyclical behavior discourages entries.

22.    The patent licensing process also imposes a significant burden on a new entrant interested in selling hoverboard products to consumers. New entrants have to spend substantial amounts of time on researching and establishing relevant patent rights, or a great amount of licensing fees have to be paid before entering into the market. Such expenses and time commitments present a high entry barrier for the hoverboard market.

23.    The market for hoverboard products is highly concentrated. Upon information and belief, as of 2019, Segway-Ninebot, DGL Group, Ltd. ("DGL") and Defendants had been holding largest market shares of hoverboard in the world. Upon information and belief, Defendants now are one of the biggest hoverboard manufacturers and sellers in the world.

///

////

///

## B.  Defendants' Anticompetitive Conducts

24.     Upon information and belief, Defendants possess monopoly power in the relevant antitrust market and have possessed that monopoly power at all relevant times to this Complaint.

25.     Upon information and belief, the substantial evidence showing that Defendants demonstrate abilities to control price and exclude competition to possess monopoly power in the relevant market.

26.     Defendants' market shares and monopoly power in the relevant market have not been achieved by virtue of superior acumen, innovation, skill, foresight, or industry, by the proper functioning of the market, or by natural market conditions. Instead, such monopoly power has been achieved as a result of Defendants' anticompetitive conducts including purposeful abuse of the judicial system and engaging in a series of sham patent litigations.

27.     As a result of Defendants' anticompetitive actions, many competitors have essentially no choice but to pay a huge amount of royalties to Defendants in order to sell their hoverboard products in the market, and Defendants' resultant market power has permitted them to raise prices of hoverboards to supra-competitive levels and to generate significant monopoly profits on such sales.

///

///

**Defendants Frequently Brought Patent Infringement Litigations Against Their Major Competitors**

28.     Beginning in early August 2016, Defendants started to issue Cease & Desist letters to more than a dozen resellers for Swagway LLC ("Swagway"), one of its biggest competitors in the hoverboard market, demanding immediate desistance of patent infringement activities. Some resellers complied, yet others continue to sell the alleged infringing products. *See Hangzhou Chic Intelligent Technology Co., Ltd. v. Swagway LLC*, Case No. 16-cv-04804-HSG (N.D. Cal. 2016).

29.     On or about August 19, 2016, Chic Intelligence brought a patent infringement lawsuit in the U.S. District Court Northern District of California against Swagway. Nevertheless, Swagway counterclaimed that Chic Intelligence made false and defamatory comments regarding its products.

30.     In the same year, Chic Intelligence incorporated with the same strategy filling a patent infringement lawsuit in the U.S. District Court Central District of California against one of its biggest hoverboard competitors, Razor USA LLC ("Razor").

31.     Beginning in 2018 and continuing through February 2019, Defendants began lodging complaints with Amazon, asserting that the hoverboards sold and produced through Golabs, Inc. ("Golabs") infringed on Defendants' design patents.

32.    On or about March 26, 2019, Unicorn brought another patent infringement lawsuit in the U.S. District Court Northern District of Texas against Golabs.

33.    On or about August 17, 2020, Chic Intelligent and Unicorn initiated a lawsuit against Plaintiff for patent infringement captioned *ABC Corporation I et al (Hangzhou Chic Intelligent Technology Co., Ltd and Unicorn Global, Inc.) v. The Partnerships and Unincorporated Associations Identified on Schedule "A"*, No. 1:20-cv-04806 (E.D. Ill) in the United State District Court for the Northern District of Illinois (the "Illinois Lawsuit").

34.    On or about October 2, 2020, Chic Intelligent and Unicorn initiated another patent infringement lawsuit against various defendants including some Plaintiff's resellers and Tomoloo Technology Industrial Co., Ltd., one of its biggest hoverboard competitors in the United State District Court for the Northern District of Illinois. *See Hangzhou Chic Intelligent Technology Co., Ltd. v. The Partnerships and Unincorporated Associations Identified on Schedule "A"*, Case No. 20-cv-05905 (E.D. Ill).

35.    On or about March 18, 2021, Defendants again, incorporated with the same strategy, filed another patent infringement lawsuit against its competitor DGL in the U.S. District Courts, New York Eastern District.

36.     Upon information and belief, Defendants also have threatened to file patent infringement lawsuits against various competitors and their resellers by issuing numerous demand letters.

**Defendants' Purposeful Abuse of Judicial System to Exclude Plaintiff and Its Resellers from the Hoverboard Market**

37.     In the Illinois Lawsuit, Chic Intelligent and Unicorn allege that four of Defendants' U.S. Design Patents D737,723 ("D'723 patent"), D738,256 ("D'256 patent"), D785,112 ("D'112 patent"), D784,195 ("D'195 patent") (collectively, "Defendants' Patents") have been infringed by the Gyroor-branded products made or sold by Chetaidou.

38.     Defendants' Patents are particularly designed for hoverboard products and shown with the Patent number as follows:



| Patents-in-Suit D737,723 Patent | Patents-in-Suit D738,256 Patent |
| Patents-in-Suit D784,195 Patent | Patents-in-Suit D785,112 Patent |



39.     In the Illinois Lawsuit, Chic Intelligent and Unicorn filed a complaint against numerous defendants. Subsequently, Defendants amended the complaint, and a Preliminary Injunction Order was entered subsequently on or about November 24, 2020 (the "First Preliminary Injunction Order").

40.     The First Preliminary Injunction Order was entered against defendants who operate e-commerce stores under one or more seller aliases identified in the attached Schedule A, Schedule B, and Schedule C (the "Original Schedules"). However, the Original Schedules were not attached to the First Preliminary Injunction Order as part of the court record.

41.     After the First Preliminary Injunction Order was entered, Defendants enforced the First Preliminary Injunction Order against numerous non-parties who are not listed in the Original Schedules, including Plaintiff, various resellers of Gyroor-branded products and other competitors.

42.     Ultimately, without any notice, the Amazon storefronts operated by Plaintiff, the resellers of Gyroor-branded products and other competitors were frozen by the First Preliminary Injunction Order, and their relevant assets were restrained.

43.     Thereafter, to resolve any ambiguity that has arisen due to the enforcement against the non-parties, Defendants moved to the court and add non-parties, against whom the First Preliminary Injunction Order, as named defendants by alleging that those non-parties are acting in anticipation or as affiliates with Chetaidou. The new list of defendants and accused products were listed in the "Amended Schedule A" (the "Amended Schedule A").

44.     Aside from non-parties being added as named defendants, the Amended Schedule A is more extensive than the Original Schedules.

45.     Apparently, this First Preliminary Injunction Order was wrongfully enforced against various non-parties and its scope was unreasonably expanded. By wrongfully enforcing the First Preliminary Injunction Order with mere conclusory allegation, adding resellers of Gyroor-branded products and other competitors to the First Preliminary Injunction Order at will, and restraining of their relevant assets, Defendants intentionally targeted their competitors, including Chetaidou and its relevant Gyroor brand.

46.     On or about August 9, 2021, in order to clarify the exact scope of the First Preliminary Injunction Order, Chic Intelligent filed a second preliminary

injunction motion against defendants listed in the Amended Schedule A for direct
and indirect design patent infringement.

47.     On or about October 13, 2021, without vacating the First Preliminary
Injunction Order, a second Preliminary Injunction Order was entered by the court
(the "Second Preliminary Injunction Order").

48.     To Plaintiff's surprise, additional non-parties who are not listed in the
Amended Schedule A and sell Gyroor-branded products were unreasonably joined
in the Second Preliminary Injunction Order as shown below.

**Amazon Merchant Restrained by the Second Preliminary Injunction Order**

|   | Amazon Merchant Name | Amazon Merchant ID |
|---|---|---|
| 1 | xiangxiang-us | A35GA6R9D0UV0D |
| 2 | yaohuisheng-us | A17P73Q4CL7ADK |
| 3 | shanchun-us | A2NUD2WSEZ9ZT |
| 4 | baiboyuan-us | A3OBV1BHJSJBH1 |
| 5 | guangzhourunzhoumaoyiyouxiangongsi | AMPT122SDFWCA |
| 6 | kangjuxin-us | A3FGA3GPJLAIIE |
| 7 | zhonghongxin-us | A25PYSLZ5XW50W |
| 8 | honghaiya-us | AIFII05V4L3I3 |
| 9 | junwei-us | A19J9XVUEEK8QR |
| 10 | yuwei-us | A4MTNVPTGXZZH |
| 11 | yutongcheng-us | A1JCDB3MNAG9AX |
| 12 | yanjin-us | A17JZOCRNF1QD9 |
| 13 | minghuangsheng-us | A1042U6O0WK9FR |
| 14 | guirong-us | A3C03X9QJLWAJO |
| 15 | guanjiacheng-us | A1BKW1NUP4TNYD |
| 16 | zhipeng-us | A14K5GI4JEB6O5 |
| 17 | rongjiamaoyi | A2DA8CSKTCC66B |
| 18 | JIANGYOU-US | A2WDDE8MIQH0TE |
| 19 | GYROOR US | A57BIIPQ5F3FT |
| 20 | Urbanmax | A2YJ4WYC01L51J |

| | | |
|---|---|---|
| 21 | Gyroor, also operating standalone websites as Gyroor.com and gyroorboard.com. | AHGEGWXX7DCPQ |
| 22 | Gyroshoes | A2ARNHQ8SVCIBQ |
| 23 | Fengchi-US | A11ZZ2BGHTDJWC |
| 24 | HGSM | A18SI7S9NCFNDA |
| 25 | Gaodeshang-US | AYN60ZNVZ6M1Q |

49.     The Amazon storefronts restrained by the Second Preliminary Order and identified in the list above are all resellers who sell or distribute the Gyroor-branded products.

50.     Without doubt, the scope of the Second Preliminary Injunction was unreasonably expanded once again.

51.     In the Illinois Lawsuit, Chic Intelligent and Unicorn repeatedly use the judicial governmental process as an anticompetitive weapon by unlawfully expanding the scope of the preliminary injunction orders entered by the court to harm Plaintiff's business and damage its Gyroor brand. Plaintiff has been substantially foreclosed from entering the relevant antitrust market indefinitely.

52.     As a direct result of Defendants' wrongful enforced preliminary injunction orders, Defendants has been able to abuse the judicial process to obtain preliminary injunctions to restrain the accounts and assets of Defendants' competitors including Plaintiff and its resellers and thereby prevent them from continuing selling any hoverboard product to the market.

///

**Defendants' Sham Litigation Against Plaintiff's Reseller**

53.   For more than a decade, Defendants have engaged in a series of sham patent infringement threats and lawsuits against numerous potential and current competitors that have marketed hoverboards in the United States and other countries.

54.   Shenzhen Yangjinmaoyi Ltd. Co. ("Yanjin-US") is a Chinese company organized and existing under the laws of China, having its principal place of business in Shenzhen, China.

55.   Yanjin-US sells Gyroor-brand Electric Roller Skates, also known as "hover shoes" as shown below through its Amazon storefront.



56.   On or about October 21, 2021, Yanjin-US received a notice from Amazon stating that its entire listings were removed because Yanjin-US has infringed Defendants' Patents. Yanjin-US was suggested to contact Defendants' counsel in the Illinois Lawsuit.

57.    Upon receiving this notice, Yanjin-US was astonished as it has never purchased or sold any hoverboard products.

58.    On or about January 13, 2022, Defendants' counsel for the first time contacted and notified Yanjin-US that a preliminary injunction order was issued and enforced against Yanjin-US.

59.    On or about April 4, 2022, after a lengthy investigation, Defendants found out and admitted that the Yanjin-US was wrongfully restrained and "should not have its assets restrained" in Illinois Lawsuit.

60.    On or about April 18, 2022, Yanjin-US formally requested to have its Amazon account released by Defendants.

61.    However, Defendants refused to release Yanjin-US's wrongful restrained Amazon account, denying their involvements in seeking and enforcing the preliminary injunctions against Yanjin-US, reasoning "[Chic Intelligent and Unicorn have] asserted no claims against [Yanjin-US], we never requested that [Yanjin-US'] assets be restrained."

62.    Apparently, Defendants' Patents and Yanjin-US' hover shoes products are plainly dissimilar as no reasonable person would find those designs are substantially the same and no reasonable litigant could realistically expect Defendants' success on the merits (shown below).

///

| Comparison between Defendants' and Yanjin-US' Product | |
| --- | --- |
| Patents-in-Suit D737,723 Patent | Patents-in-Suit D738,256 Patent |
|  | |
| Patents-in-Suit D784,195 Patent | Patents-in-Suit D785,112 Patent |
| | |
| Electric Roller Skate (hover shoes) sold by Yanjin-US | |
| | |

63.    Defendants' Patents are designed for hoverboards not hover shoes. Yanjin-US' hover shoes products are no way related to Defendants' Patents. Therefore, Defendants have no legitimate purpose or ground for obtaining and enforcing a preliminary injunction against Yanjin-US in the Illinois Lawsuit.

Defendants' maliciously obtained and viciously enforced preliminary injunction forced Yanjin-US to remove its legitimate listings, close its business on Amazon and cease selling any Gyroor-branded products.

64.     Moreover, Yanjin-US had reached out to Defendants' counsel insisting that its products bear no similarity to Defendant's Patents in Illinois Lawsuit and should not be subject to the preliminary injunction and asked for release from the injunction. However, Defendants refused to release Yanjin-US from the injunction regardless of the compelling facts.

65.     All of Defendants' acts described above, including its baseless patent infringement suit against Yanjin-US and wrongfully-enforced preliminary injunction against Plaintiff and other resellers, were committed by Defendants in bad faith, which the sole purpose is to impose anticompetitive effects on any reseller who carries on Gyroor-branded products, rather than the attempt to obtain a fair result from the court process.

66.     As admitted by Defendants in the Illinois Lawsuit, as Yanjin-US is a distributor on Amazon of Gyroor Products, "it is therefore neither unexpected nor unreasonable that Yanjin-US would have initially been included in the preliminary injunction order …". *See* Exhibit 1.

67.     Thus, Defendants' unlawful conducts were in violation of the Federal and California antitrust laws as well as common law unfair competition and/or unfair trade practices.

**Defendants' Similar Strategy to Exclude Plaintiff and Its Resellers from the Hoverboard Global Market**

68.     Moreover, Defendants adopt the similar strategies to attack other Gyroor-branded resellers in Europe and Canada markets.

69.     On or about May 6, 2021, Plaintiff's websites, Gyroor.com and gyroorboard.com, were forced to shut down and its website host accounts was suspended or frozen due to the Amended Schedule A adopted by the First Preliminary Injunction Order. In consequence, Plaintiff lost its abilities to sell any hoverboard products through its websites and market its hoverboard products to the public.

70.     On or about June 4, 2021, Defendants complained to Amazon Germany that Plaintiff's Gyroor-branded hoverboard products infringed Defendants' patents. Subsequently, a listing of a reseller who sells Plaintiff's hoverboard products in German was removed from Amazon marketplace.

71.     On or about June 7, 2021, Defendants complained to Amazon U.K. that Plaintiff's Gyroor-branded hoverboard products infringed Defendants' patents. Subsequently, another listing of a reseller who sells Plaintiff's hoverboard products in U.K. was removed from Amazon marketplace.

72.     On or about November 1, 2021, Defendants complained to Amazon Germany again based on the same allegations. Subsequently, another listing of a reseller who sells Plaintiff's Gyroor-branded hoverboard products in German was removed from Amazon marketplace.

73.     On or about June 16, 2022, Defendants complained to Amazon Canada that Plaintiff's Gyroor-branded hoverboard products infringed Defendants' patents. Subsequently, the listings of a reseller who sells Plaintiff's Gyroor-branded hoverboard products in Canada was removed from Amazon marketplace.

74.     On or about June 23, 2022, Defendants complained to Amazon U.K. that Plaintiff's Gyroor-branded hoverboard products infringed Defendants' patents. Subsequently, another listing of a reseller who sells Plaintiff's Gyroor-branded hoverboard products in U.K. was removed from Amazon marketplace.

75.     Defendants' complaints have caused numerous damages to Plaintiff's resellers. On average, each reseller has lost approximately $100,000 U.S. dollars due to the removal of its listings.

76.     In the end, all the market participants have ceased purchasing anything from Chetaidou and/or selling any Gyroor-brand products as they are afraid that their assets may be restrained and their listing may be removed if Gyroor-branded products are sold. Eventually, Chetaidou has been eliminated from the hoverboard

market as it is unable to sell any hoverboard products to any consumers in the United States and around the world.

77.   By eliminating Plaintiff from the hoverboard market, Defendants' market shares in the hoverboard market have increased, and their market powers have been enhanced.

**C.  Defendants' Substantive Antitrust Violations**

78.   Defendants' anticompetitive conducts have substantially lessened competition and maintained their monopoly in the relevant market for hoverboard products. Those conducts also had the following anticompetitive effects:

a.     Plaintiffs and other competitors were substantially foreclosed from the market for hoverboard products;

b.     Resellers were prevented from offering consumers a wide selection of hoverboard products;

c.     Consumers were prevented from purchasing lower-cost, different functions and designs hoverboards, causing them to pay higher prices; and

d.     Consumers were denied the choices of competing hoverboard products.

79.   There are no pro-competitive justifications for Defendants' conducts, which serve only to preserve Defendants' monopoly and resulting profits. It does nothing to advance market efficiency or consumer welfare. To the contrary,

Defendants' anticompetitive conducts have damaged competition, raised prices, and diminished choices for resellers and consumers.

80.     Those lawsuits brought by Defendants are subjectively motivated by their intents to eliminate competition in and exclude competitors from the hoverboard market. Defendants have filed and maintained the lawsuits not because they have reasonable chances of prevailing on the merits, but because they hope to use the lawsuits as an anticompetitive weapon to attack other competitors who are in the hoverboard markets.

81.     Defendants' Agreements have had and continue to have an exclusionary effect that unreasonably restrains trade. All the infringement lawsuits brought by Defendants were a mere sham to cover what is actually nothing more than an attempt to interfere directly with the business relationships of their competitors.

82.     As numerous lawsuits have been filed by Defendants, most of the parties had reached settlements with Defendants by ending up with signing the licensing and/or settlement agreements with Defendants and/or paying great amount of royalties to Defendants.

83.     When each and every hoverboard sold in the market will have to pay royalty to Defendants, not only the consumer is paying more for the "license" but will ultimately result a monopoly.

84.     Defendants' illegal conducts disrupt competition in the relevant market. Defendants are enabled, free from competitive discipline, to continue to demand higher prices from its customers for hoverboard products. In turn, Defendants' anticompetitive conduct has resulted in the ultimate consumers being harmed by having to pay higher prices for hoverboard products.

85.     Defendants' illegal conduct has succeeded in substantially foreclosing all meaningful competition from the relevant market and substantially lessened competition and tended to create and maintain a monopoly, by keeping competitors from selling to a substantial share of the relevant antitrust market.

86.     Overall, the competitions in the hoverboard market have been reduced, and the smaller businesses and consumers in the relevant market have been harmed.

87.     As a direct and proximate result of the violation alleged herein, Plaintiff's contractual relationships with Amazon and its existing and prospective resellers and customers have been disrupted. Plaintiff was forced to cease selling its hoverboard products through Amazon and to its reseller and customers, which have caused serious interference with Plaintiff's business operation.

88.     Defendants' illegal monopolization and exclusive dealing substantially foreclosed Plaintiff from entering the relevant antitrust market for hoverboard products, thereby causing Plaintiff to lose prospective profits on the sale of the hoverboards.

89.    Plaintiff was almost totally foreclosed from selling any of its hoverboard products to online resellers and customers, which is the main platform for generating revenues.

90.    Since Defendants has been able to abuse the judicial process to obtain preliminary injunctions to restrain Plaintiff's accounts and assets and prevent Plaintiff from continuing selling its hoverboards, Plaintiff has been substantially foreclosed from entering the relevant antitrust market indefinitely.

91.    Plaintiff's business relationships with its retail sellers have been disrupted for more than a year because of Defendants' anticompetitive conducts.

92.    Plaintiff's business relationship with Amazon is also intermeddled with based on Defendants' wrongfully enforced preliminary injunction orders. Amazon had no choice but to close Plaintiff's accounts and froze its assets. Plaintiff's webpage on Amazon also had to be removed.

93.    By wrongfully enforcing the Preliminary Injunction Order against Plaintiff, Plaintiff has suffered tremendous loss. Plaintiff has lost its capacity to generate any revenues or profits in the United States. Further, Plaintiff's ability to uphold its contractual obligations with Amazon and its consumers was interfered. Further, Plaintiff's goodwill and business reputation have been negatively affected. Plaintiff's reputation and its Amazon store ranking have been ruined.

94.     All of Defendants' acts described above, including the wrongfully-enforced preliminary injunction against Plaintiff and baseless complaints against Plaintiff's resellers, were committed by Defendants in bad faith, which the sole purpose is to impose anticompetitive effects on anyone who carries on Gyroor-branded products in order to eliminate Plaintiff from the hoverboard market and thereby reduce the competitions in the relevant market and gain more monopoly powers.

95.     Defendants' unlawful conducts were in violation of the Federal and California antitrust laws as well as common law unfair competition and/or unfair trade practices.

## INTERESTATE COMMERCE

96.     The products at issue in this action are sold in interstate commerce, and the unlawful activities alleged in this Complaint have occurred in, and have a substantial effect upon, interstate commerce.

## CLAIMS FOR RELIEF

## COUNT I
## VIOLATION OF SECTION 1 OF THE SHERMAN ACT (15 U.S.C §1)

97.     Plaintiff incorporates herein by reference each of the allegations of paragraph 1 through 96 above, as though set forth in full.

98.     Upon information and belief, Defendants have engaged in the predatory conduct described above with a specific intent to restrain the trade and commerce described above in violation of Section 1 of Sherman Act, 15 U.S.C. §1.

99.     Upon information and belief, the aforesaid violations of the Sherman Act consisted, without limitation, of a continuing contract, combination, conspiracy, trust, and concert of action among the Defendants and others, concerning the sale or distribution of the hoverboard products.

100.    Upon information and belief, the aforesaid contract, combination, conspiracy, trust, and concert of action has had the following effects including competition in the sale of hoverboard products has been suppressed and/or restrained; prices of the hoverboard products have been raised fixed, maintained, and stabilized at artificial and non-competitive levels.

101.    By reasons of the violations of the antitrust laws, Plaintiff has been injured in its business and property and has suffered damages in an amount according to proof at trial.

**COUNT II**
**VIOLATION OF SECTION 2 OF THE SHERMAN ACT (15 U.S.C §2)**

102.    Plaintiff incorporates by reference the allegations contained in paragraph 1 through 101 above, as though set in full.

103.    Upon information and belief, the hoverboard product market is a valid antitrust market. The market is global in scope and includes the United States.

104.   Upon information and belief, the conducts of Defendants complained of herein occurred in or affected interstate commerce.

105.   Upon information and belief, Defendants willfully acted to attempt to acquire and maintain monopoly power in the relevant hoverboard product market by engaging in anticompetitive conduct.

106.   Upon information and belief, Defendants willfully acted with the specific intent to monopolize the relevant hoverboard product market and that there is dangerous probability of Defendants achieving and/or further enhancing monopoly power in the relevant market and to lessen and/or destroy competition in that market.

107.   Upon information and belief, Defendants have intentionally attempted to obtain monopoly power and the ability to control prices in the market.

108.   By harming Plaintiff, Defendants' conduct has the further effect of harming other competitors, customers and consumers in the market.

109.   Upon information and belief, Defendants possess monopoly the relevant market.

110.   Upon information and belief, Defendants willfully acted to acquire and maintain monopoly power in the relevant market by engaging in their anticompetitive conducts.

111.   Upon information and belief, Defendants' actions have had or will have the following effects: competition in the market has and will be impaired and restrained, and Defendants have illegally obtained the power to control prices and/or restrain and exclude competition in the market, thereby affecting interstate commerce.

112.   Unless Defendants exclusionary and anticompetitive conducts are declared to be unlawful, Plaintiff is and will continue to be injured in its business and property and will suffer substantial and irreparable harm.

## COUNT III
## VIOLATION OF THE CA CARTWRIGHT ACT
## (CAL BUS. & PROF CODE §16720)

113.   Plaintiff incorporates by reference the allegations contained in paragraph 1 through 112 above, as though set in full.

114.   Upon information and belief, Defendants' unlawful activities harm competition in the market by eliminating their competitors from the competition. Defendants' Agreement also has the effect of raising costs for consumers, thus weakening competition, further enhancing their monopoly and ability to raise prices, and unreasonably restrain trade.

115.   The conspiratorial conduct alleged herein has harmed and continues to harm competition for hoverboard products, which are products in the flow of interstate commerce.

116.   As a result of the conduct alleged herein, Plaintiff, its resellers, its customers, and the consuming public are and will continued to be harmed in the form of increased prices and decreased competition in the market.

## COUNT IV
## VIOLATION OF CALIFORNIA UNFAIR COMPETITION LAW
## (CAL BUS. & PROF CODE §17200)

117.   Plaintiff incorporates by reference the allegations contained in paragraph 1 through 116 above, as though set in full.

118.   By the acts and conduct alleged, Defendants have engaged in unfair competition within the meaning of the California Business & Professions Code §17200, et seq. and the common law.

119.   The acts of Defendants violate and/or threaten to violate the policy or spirit of the antitrust laws, and otherwise significantly threaten and/or harm competition. By the deceptive acts, practices, and conduct alleged above, Defendants are violating Section 1 and 2 of the Sherman Act and 16700 et seq. of the Cartwright Act, Cal. Bus. & Prof Code Section, which has injured competition, as well as consumers in California and elsewhere.

120.   By reason for Defendants' acts, Plaintiff also has suffered, and will continued to suffer, irreparable harm, for which Plaintiff has no adequate remedy at law. Unless and until Defendants' conducts are enjoined, Defendants will continue to engage in the acts alleged herein.

121.   Plaintiff is entitled to relief, including an injunction and/or restitution.

**COUNT V**
**TORTIOUS INTERFERENCE WITH**
**CONTRACTUAL RELATIONSHIP**

122.   Plaintiff incorporates by reference the allegations contained in paragraph 1 through 121 above, as though set in full.

123.   "To recover in tort for intentional interference with the performance of a contract, a plaintiff must prove: (1) a valid contract between plaintiff and another party; (2) defendant's knowledge of the contract; (3) defendant's intentional acts designed to induce a breach or disruption of the contractual relationship; (4) actual breach or disruption of the contractual relationship; and (5) resulting damage. [Citation.] In this way, the 'expectation that the parties will honor the terms of the contract is protected against officious intermeddlers." *Applied Equipment Corp. v. Litton Saudi Arabia Ltd.* (1994) 7 Cal.4th 503, 514, fn. 5, 28 Cal.Rptr.2d 475, 869 P.2d 454.

124.   Plaintiff had a valid and existing contract with Amazon to sell its hoverboard products through its Amazon storefront.

125.   Plaintiff had a valid and existing contract with its resellers to sell its hoverboard products to resellers and/or consumers.

126.   Defendants knew or should have known of Plaintiff's contractual relationships with the Amazon and its resellers.

127. Defendants intentionally interfered with Plaintiff's contractual relationships with Amazon and its resellers. Defendants knowingly and intentionally, by ways of adding Plaintiff's resellers to the Preliminary Injunction Order and asserting false allegations of patent infringement against Plaintiff's reseller, requested Amazon to remove Plaintiff and its resellers' hoverboard product listing and to restrain their relevant assets.

128. As a result of Defendants' wrongful acts, Plaintiff and its resellers' products were delisted and eliminated from competition.

129. Plaintiff has suffered direct, proximate and foreseeable damages and continues to suffer direct, proximate and foreseeable damages.

130. By reason of Defendants' acts, Plaintiff is entitled to equitable remedies and damages in an amount to be proven at trial.

## COUNT VI
## TORTIOUS INTERFERENCE WITH PROSPECTIVE ECONOMIC ADVANTAGE

131. Plaintiff incorporates by reference the allegations contained in paragraph 1 through 130 above, as though set in full.

132. Plaintiff has valuable business relationships with its customers in this Judicial District and throughout the United States. Defendants knew or should have known these business relationships because Defendants are fully aware that Plaintiff was selling its hoverboards through Amazon and to its resellers and/or customers.

133.   There were existing business or economic relationships between Plaintiff and its resellers and/or customers, and these relationships were reasonably certain to produce further economic benefits to Plaintiff.

134.   On information and belief, Defendants intentionally and in bad faith committed wrongful acts designed to interfere with or disrupt these relationships by wrongfully enforcing the preliminary injunction orders.

135.   Plaintiff suffered damages caused by the disruption of the above-mentioned relationships.

136.   Plaintiff is informed, and believes, and based thereon alleges that Defendants acted with fraud, malice, and oppression, such that an award of punitive damages is justified.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff prays for relief as follows:

1.      For judgement that Defendants have violated section 1 of the Sherman Act (15 U.S.C §§1);

2.      For judgement that Defendants have violated section 2 of the Sherman Act (15 U.S.C §§2);

3.      For judgement that Defendants have violated section 16720 of the Cartwright Act (Cal. Bus. & Prof. Code §16720, *et seq*.);

4.      For judgement that Defendants have violated section 17000 of the California Business Profession Code.

5.      For an award of damages according to proof, trebled as required by law (15 U.S.C §15 and Cal. Bus. & Prof. Code §§16750 and 17082).

6.      For judgment that Plaintiff recovers from Defendants its reasonable attorneys' fees.

7.      For judgment that Plaintiff recovers from Defendants prejudgment interest.

8.      For judgment that Plaintiff recovers from Defendants its costs.

9.      Any relief as the Court deems appropriate.

Date: 07/20/2022                              /s/ Tianyu Ju
                                              Tianyu Ju, Esq.
                                              iris.ju@glacier.law
                                              Glacier Law LLP
                                              ***Attorney for Plaintiff***